Joseph D. FELDMAN, on behalf of
himself and all others similarly
situated, Plaintiff-Appellant,

v.

SIMKINS INDUSTRIES, INC.,
Defendant-Appellee.

No. 80–4372.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1982.

Decided June 22, 1982.

David B. Gold, David B. Gold, Law Corp., San Francisco, Cal., for plaintiff-appellant.

Paul Rosen, Spector, Cohen, Hunt & Rosen, Philadelphia, Pa., argued, for defendant-appellee; Michael R. Jencks, San Francisco, Cal., on brief.

Before SNEED and TANG, Circuit Judges, and STEPHENS,* District Judge.

*Honorable Albert Lee Stephens, Jr., Senior District Judge for the Central District of Califor-

TANG, Circuit Judge.

This is an appeal from the dismissal by summary judgment and directed verdict against Plaintiffs' claims that Defendant violated federal and state securities laws. We affirm.

FACTS

Between 1974 and 1977 Simkins Industries, Inc. (Simkins) acquired Fibreboard Corporation (Fibreboard) stock representing 14% of Fibreboard's outstanding shares. It paid an average price of approximately $15.25 per share. By late 1977, however, Simkins had become dissatisfied with its investment in Fibreboard. Fibreboard appeared to Simkins to be poorly managed; its stock was trading at low market prices; and the company often failed to pay dividends. Moreover, the relationship between Leon Simkins, the president of Simkins Industries, and Fibreboard management had become one of open hostility. Simkins had been denied a seat on the Fibreboard board of directors, and his suits against the company's management had been widely-publicized.

During late 1977 and early 1978, rumors began circulating in the financial community that Fibreboard was a merger candidate.

On January 26, 1978, without Leon Simkins' knowledge or participation, Fibreboard and Louisiana-Pacific Corporation (L–P) prepared and disseminated a press release announcing L–P's merger offer to acquire all of Fibreboard's common stock at $15 per share. The release indicated that the offer was conditioned on, among other things, approval of Fibreboard's three largest shareholders, including Simkins. The substance of that announcement went out on the Dow Jones tape at 8:35 a. m. EST. On that day, 72,700 shares of Fibreboard common stock were traded on the NYSE at prices ranging from $14.625 to $13.875 and closing at $14.625 per share. During the next several days, reporters interviewed Leon Simkins and officials of the other two largest shareholders and reported in the

nia, sitting by designation.

press that these individuals did not consider the $15 offer to be acceptable. The articles' authors also included their own commentary about the possibility that the merger would eventually be consummated at a price higher than $15.

On January 27, 1978, 298,100 shares of Fibreboard common stock were traded on the NYSE at prices ranging from $16.75 to $14.375, closing at $16.125 per share. Articles appeared in the *Wall Street Journal* and the *San Francisco Chronicle* that day, commenting on the shareholder approval requirements for the merger, the companies' financial situations, and the continuing merger discussions with other companies. A *San Francisco Examiner* article quoted Leon Simkins as characterizing the L–P bid as "not sufficient." The article reported that Simkins "wouldn't accept the $15 tender for his 14 percent interest in Fibreboard," and that "[h]e declined to set a target figure that would be acceptable."

On that day, Simkins began to sell shares of Fibreboard when the price per share had risen to near $17. The sales were made in ten or twenty thousand share lots with stop orders at set minimum prices. At the end of trading that day, Simkins had sold 67,200 shares at an average price of $16.376 per share.

On January 30, 1978, following the weekend, 207,700 shares of Fibreboard common stock were traded on the NYSE at prices ranging from $16.375 to $15.75, closing at $16 per share. Simkins sold 115,000 shares of Fibreboard through its broker, Bear, Stearns, & Co., in transactions similar to those of the preceding trading day. The purchase price averaged $16.034 per share. On the following day, January 31, 463,700 shares of Fibreboard common stock were traded on the NYSE; prices ranged from $15.875 to $14.625, closing at $15 per share. Simkins sold a total of 295,000 shares through Bear, Stearns. The sales for that day averaged slightly over $15 per share.

Plaintiff Feldman purchased 500 shares of Fibreboard at $14.875 per share on January 31, 1978, after his broker had advised him of the pending L–P merger offer. At 6

p. m. that day, L–P issued a press release announcing the formal withdrawal of its offer to purchase Fibreboard stock at $15 per share. A Dow Jones tape release and articles in the *Wall Street Journal* and *San Francisco Examiner* publicized the withdrawal and quoted an L–P spokesman as stating that the offer was withdrawn when the three largest shareholders rejected the $15 price. (L–P's offer specified that the offer would expire if the approval of the shareholders was not obtained by January 31, 1978). On February 1, 1978, Simkins disclosed to the SEC, NYSE, and Fibreboard (as required by § 13(d)(2) of the Exchange Act), the sale of its 477,200 shares of Fibreboard common stock.

On February 2, plaintiff Feldman sold his 500 shares of Fibreboard common stock for an average price of $14.175. On that day also, Fibreboard issued a news release stating that discussions with a number of companies concerning possible acquisitions would continue. On March 10, 1978, L–P and Fibreboard announced agreement in principle on a merger at $17 per share; on March 23, the parties signed an agreement approving the merger at that price.

Feldman brought this action against Simkins Industries, Inc. and a brokerage house, Bear, Stearns & Co. ("Bear, Stearns") for violations of § 17(a) of the Securities Act (15 U.S.C. § 77q(a)), § 10(b) of the Exchange Act (15 U.S.C. 78j) its implementing Rule 10b–5 (17 C.F.R. § 240.10b–5), §§ 5, 12 of the Securities Act (15 U.S.C. §§ 77e, 77*l*(1)), § 13(d)(2) of the Exchange Act (15 U.S.C. § 78m(d)(2)) and state law. By summary judgment the court disposed of plaintiff's claims under §§ 5, 12, 13(d) and state law. On October 19, 1979, the court certified the proceeding as a class action brought on behalf of a plaintiff class composed of "[a]ll persons who purchased Fibreboard Corporation common stock from January 26, 1978 through January 31, 1978, inclusive." The action went to trial before a jury on April 7, 1980. Upon completion of plaintiff's case, the court advised the parties that it would grant defendants' motion for a directed verdict on the remaining § 17(a) and § 10(b) claims.

Plaintiff appeals asserting the district court erred in:

(1) applying the standard for dismissing, by directed verdict, plaintiffs' claims under § 10(b) of the Exchange Act and § 17(a) of the Securities Act;

(2) concluding that there was insufficient evidence to support plaintiffs' contention that:

 (a) defendant was an "insider" thus owing a duty of disclosure;

 (b) defendant manipulated the market;

 (c) plaintiff had suffered damages;

(3) concluding that §§ 10(b) and 17(a) are "coterminous for the purposes of this litigation";

(4) concluding that defendant was not required to file a registration statement pursuant to §§ 5 and 12 of the Securities Act prior to selling its stock;

(5) concluding that defendant's reporting of its sales of stock were timely made under § 13(d) of the Exchange Act;

(6) concluding that defendant did not stand in a fiduciary relationship to plaintiff for purposes of California securities law; and

(7) excluding certain of plaintiffs' exhibits as inadmissible.

For the reasons stated in the district court's thorough and well-reasoned opinion below, 492 F.Supp. 839 (1980), and for the following additional reasons, we affirm the district court's judgments.

## DISCUSSION

I. *Standard for dismissal by directed verdict.*

▆▆▆ Plaintiff correctly maintains that the district court when considering a motion for directed verdict must consider all the evidence and resolve all inferences in favor of the party with the burden of persuasion. *See Cal. Computer Products v. Intern. Business Machines*, 613 F.2d 727, 733 (9th Cir. 1979). We disagree with the plaintiffs' contention, however, that the district court failed to apply this standard. The district court acknowledged the applicable standard. 492 F.Supp. at 841. Moreover, for a party opposing a motion for directed verdict to benefit from the favorable inferences, it must present "substantial evidence" in support of its claims. *Id.* Our review of the record, as discussed below, persuades us that plaintiff failed to present substantial evidence in support of his § 10(b) and § 17(a) claims. The district court's dismissal of those claims by directed verdict is therefore affirmed.

II. *Feldman's claims under § 10(b) of the Exchange Act.[1]*

A. *Insider Liability*

▆▆ Feldman correctly argues that a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him. Feldman fails, however, to show by substantial evidence that Simkins was an insider.

**1.** Rule 10b–5, 17 CFR 240.10b–5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

 (1) to employ any device, scheme, or artifice to defraud,

 (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

As to insiders, the essence of the Rule is that anyone who, trading for his own account in the securities of a corporation has "access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone" may not take "advantage of such information knowing it is unavailable to those with whom he is dealing," i.e., the investing public. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (citing *Matter of Cady, Roberts & Co.*, 40 SEC 907, 912 (1961).

Simkins publicly stated his belief that the merger offer of $15.00 per share was insufficient. Feldman asserts these statements artificially inflated the stock's price and that in these circumstances, Simkins had a duty under 10b–5 to disclose the fact that he planned to sell his stock in Fibreboard.

■ Insider status is normally reserved for officers, directors, controlling shareholders of a corporation or to those having a special relationship affording access to inside information. *Chiarella v. United States*, 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 1005 (2d Cir. 1968), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971).

■ The test to determine insider status is whether the person has access to confidential information intended to be available only for a corporate purpose and not for the personal benefit of anyone. *Matter of Cady, Roberts & Co.*, 40 SEC 907, 912 (1961). Simkins had no such access. As the district court pointed out, "[h]e was not a controlling shareholder ... he did not even have representation on the board of directors and it is not contended that he had access to any non-public corporate information."

Moreover, the duty of disclosure does not encompass a duty to confer upon outside investors the benefit of the insider's superior financial or other expert analysis. *Texas Gulf Sulphur*, 401 F.2d at 848. Because Simkins' decision to sell his Fibreboard holdings was based on his analysis of the market, and not on insider corporate information, he cannot be held liable for any failure to disclose.

## B. *Market Manipulation*

■ Feldman contends that Simkins' conduct constituted market manipulation. He relies principally on *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979). Even assuming the continuing vitality of *Zweig* (see the district court's opinion 492 F.Supp. at 845 questioning the vitality of *Zweig* in light of

*Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)), we conclude defendant is not liable for market manipulation. In *Zweig*, plaintiffs sued a financial columnist, alleging that he had violated Section 10(b) by purchasing stock in a company at a discount, publishing a favorable column about the company, waiting for a resulting rise in the market, and then selling the stock at a profit. In reversing a judgment dismissing the complaint, the court held that the facts raised a triable issue whether the columnist, by trading in securities of companies on which he reported and failing to disclose that fact in his column, intended to manipulate the market for his own personal gain by falsely creating an aura of unbiased advice. *Zweig* may be distilled thusly: Where a financial adviser gives advice with regard to a stock he has or intends to purchase or sell, he has a conflict of interest. Where such a conflict is not apparent to other investors, he is under a duty to disclose the conflict.

■ Simkins' statements cannot be fairly characterized as advice in the same sense as those of the defendant in *Zweig*. Moreover, Simkins' holdings of stock was public knowledge as was his desire to liquidate them. Therefore, any conflict of interest which Simkins' statements may have raised was apparent to investors. The district court correctly distinguished *Zweig* from the instant case. Simkins took no affirmative action to influence or affect the market. His responses to inquiries were truthful. Simkins' statements were simply not misleading. *Zweig* affords Feldman little support for his claim of market manipulation.

## C. *Damages*

Because we conclude that Feldman failed to establish liability, we need not address the question of whether the district court properly dismissed his 10(b) claim for failure to establish damages.

## III. *Liability under § 17(a).*[2]

The district court concluded that it was unnecessary to decide whether plaintiff had a right of action under § 17(a) "inasmuch as § 17(a) is coterminous with § 10(b) of the Exchange Act for purposes of this litigation. Although § 17(a) may differ with respect to questions of venue, jurisdiction, available remedies or persons liable, none of these issues affects the outcome of this decision." 492 F.Supp. at 841, n.1

 Feldman vigorously argues that the two sections are not coterminous. He contends that § 10(b) requires proof of defendant's scienter and that § 17(a) does not. Feldman misapprehends the import of the district court's ruling. The district court dismissed the 10(b) claim for Feldman's failure to establish, by substantial evidence, a *duty* imposed on defendant to disclose nonpublic information. Establishing a duty to disclose is just as essential in a 10(b) claim as it is in a 17(a) claim. Even assuming, as Feldman contends, that the scienter requirement of 10(b) is absent in a 17(a) claim, he has still failed to establish a duty to disclose. Insofar as both sections require a showing of a duty to disclose the district court did not err in concluding that 17(a) and 10(b) are "coterminous for purposes of this litigation."

## IV. *The necessity of a registration statement under §§ 5 and 12 of the Securities Act.*[3]

 Section 4(1) of the Securities Act (15 U.S.C. § 77d(1)), exempts securities from the registration requirements of §§ 5 and 12 if they are not offered or sold by an issuer, underwriter or dealer. Section 4(1) was designed to exempt routine trading transactions with respect to securities already issued. *SEC v. Murphy*, 626 F.2d 633, 648 (9th Cir. 1980). It does not appear that Simkins was an issuer, underwriter or dealer within the meaning of the Act. *See* 15 U.S.C. § 77b(4), (11) and (12).

 Moreover, even assuming, as did the district court, that Simkins did not fit within the § 4(1) exception to the registration requirement, Feldman failed to establish privity between himself and Simkins as required by § 12.

Under rule 56(c) the moving party has the initial burden of showing absence of a genuine issue of material fact, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 343–44 (9th Cir. 1978) but if the movant satisfies the initial burden, the burden shifts to the opponent to come forward with specific facts showing that a genuine factual issue remains for trial. Federal Rule of Civil Procedure 56(e). The opponent must present these facts in evidentiary form; he cannot rest on his pleadings. *United States v. Allen*, 578 F.2d 236, 237 (9th Cir. 1978). Moreover, the evidence he offers in opposition to the motion for summary judgment must be "significantly probative" as to any fact claimed to be disputed. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Ruffin v. Los Angeles County*, 607 F.2d 1276, 1280 (9th Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

---

**2.** Section 17(a) provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

**3.** Section 5 (15 U.S.C. § 77e) makes it unlawful for a person, directly or indirectly, to, among other things, use instruments of interstate commerce to sell a security unless a registration statement is in effect as to the security.

Section 12 (15 U.S.C. § 77*l*) makes any person in violation of § 5 liable to the person purchasing such security from him.

Simkins satisfied his initial burden by offering evidence which matched the purchase by Feldman's broker against a sale of an equal number of shares at the same time and price from Benjamin Jacobson & Sons (as opposed to Simkins' broker, Bear, Stearns).

The duty thus shifted to Feldman to produce "significantly probative" evidence raising a genuine issue of material fact. All that Feldman offered was evidence that his broker also purchased Fibreboard stock from Simkins' broker, and that nearly one-half of the Fibreboard shares traded during the relevant period came from Simkins' holdings. None of this is "significantly probative" of the alleged buyer-seller relationship between Feldman and Simkins.

Because Simkins was neither an issuer, underwriter or dealer of Fibreboard stock for purposes of § 12, and because Feldman failed to establish by "significantly probative" evidence that privity existed between himself and Simkins, the district court's grant of summary judgment is affirmed.

### V. *Timeliness under § 13(d) of defendant's reporting of its sales of stock.*

 Section 13(d)(1) (15 U.S.C. § 78m(d)(1)) requires persons who acquire certain classes and amounts of securities to file disclosure statements. If any material changes occur in the facts set forth in the statements, § 13(d)(2) requires that an amended statement be filed.

The purpose of § 13(d)(1) is to alert the market place to every rapid aggregation or accumulation of securities. Purchasers of securities (who acquire a greater than 10% equity interest in a corporation) are allowed 10 days following the acquisition in which to file the required § 13(d)(1) statement.

Simkins filed a schedule 13(d)(2) amendment the first day after its sales were completed (the fourth trading day after beginning its sales). The district court was justified in concluding that Simkins' filing was "prompt" as a matter of law.

### VI. *Feldman's State law claims.*

The district court stated that the parties cited no authority nor was it itself aware of any that imposed fiduciary duties on a shareholder such as Simkins to *prospective* investors. Feldman does not dispute the court's finding that Feldman was merely a prospective investor. Instead, he contends that the district court erred in interpreting California law to provide standing only to minority shareholders to bring such a claim.

 As a general rule, however, interpretations of state law by a district judge as the law of the state in which he sits, are entitled to deference. The district court's determination will be accepted on review unless it is shown to be "clearly wrong". *Clark v. Musick,* 623 F.2d 89, 91 (9th Cir. 1980). Feldman cites no authority which disputes the district court's interpretation of California law. Because Feldman has failed to show the district court's interpretation of state law to be "clearly wrong", the dismissal of Feldman's state law claim is affirmed.

 Feldman alternatively contends that even if he was not a Fibreboard shareholder simultaneously with Simkins, other class members who purchased prior to January 31 were. Even so, Feldman cannot pursue such claims under the laws of class representation. A plaintiff without a claim cannot represent a class of persons with possible claims. *Bailey v. Patterson,* 369 U.S. 31, 32–33, 82 S.Ct. 549, 550–51, 7 L.Ed.2d 512 (1962); *Vun Cannon v. Breed,* 565 F.2d 1096, 1098–99 (9th Cir. 1977).

### VII. *Admissibility of plaintiffs' exhibits.*

Plaintiff sought to introduce exhibits 8 and 31 through 34 to show that Simkins had a preconceived plan to dispose of all of his Fibreboard stock. Because we concluded in part II above that Simkins was under no duty to disclose his plan, if any, to sell his stocks, any error the district court may have made in failing to admit those exhibits would be harmless. We therefore need not decide whether the exhibits were admissible.

Because we find no violation of state or federal securities laws, and no reversible error in the district court's dismissal of claims and exclusion of certain evidence, the judgments of the district court are AFFIRMED.