PPM AMERICA, INC.; London Pacific Life & Annuity Company; Trans–America Life Insurance & Annuity Company; Transamerica Income Shares, Inc.; National Home Life Assurance Company; Commonwealth Life Insurance Company; Provident Mutual Life Insurance Company of Philadelphia; Security Mutual Life Insurance Company of New York; Security Equity Life Insurance Company; Utica National Life Insurance Company and Peoples Security Life Insurance Company, Plaintiffs,

v.

MARRIOTT CORPORATION; J. Willard Marriott, Jr.; Richard E. Marriott and Stephen F. Bollenbach, Defendants.

Civ. No. H–92–3068.

United States District Court, D. Maryland.

Jan. 25, 1995.

Lawrence Kill, Steven Cooper, Jordan W. Siev, T. Michael Johnson and Anderson, Kill, Olick & Oshinksy, New York City, for plaintiffs.

Arne M. Sorenson, Everett C. Johnson, Jr., Curtis P. Lu, Anat Hakim and Latham & Watkins, Washington, DC and Richard J. Magid and Whiteford, Taylor & Preston, Baltimore, MD, for defendants.

ALEXANDER HARVEY, II, Senior District Judge.

In two prior published opinions, this Court rendered rulings on pretrial matters in this civil action. The Court's Memorandum and Order of April 22, 1993 granted defendants' motion to dismiss in part and denied it in part. *PPM America, Inc. v. Marriott Corp.*, 820 F.Supp. 970 (D.Md.1993) ("*PPM America I*"). In its later Opinion of May 23, 1994, the Court granted defendants' motion for summary judgment in part and denied it in part, and also granted the counterclaim defendants' motion for summary judgment addressed to the counterclaim of Marriott Corporation (hereinafter "Marriott"). *PPM America, Inc. v. Marriott Corporation*, 853 F.Supp. 860 (D.Md.1994) ("*PPM America II*").

Following the entry of a Joint Pretrial Order, the case then came on for trial before a jury. The trial lasted approximately three and one-half weeks. After deliberating for some fourteen hours over a period of three days, the jury indicated that it was hopelessly deadlocked. On October 19, 1994, the Court declared a mistrial and discharged the jury.

Presently pending before the Court are post-trial motions filed both by plaintiffs and by defendants. Plaintiffs have filed a motion for judgment as a matter of law or in the alternative for a new trial. Defendants in turn have filed a renewed motion for judgment as a matter of law on all of the remaining claims asserted in this case by plaintiffs.[1]

Extensive memoranda in support of and in opposition to these motions have been filed by the parties and reviewed by the Court. A hearing was held in open court on the pending motions on January 6, 1995. For the reasons stated herein, defendants' renewed motion for judgment as a matter of law will be granted, and plaintiffs' motion for judgment as a matter of law or in the alternative for a new trial will be denied.

## I

### Background

The background facts of this litigation were set forth in some detail in the Court's prior Opinion of May 23, 1994. *See PPM America II*, 853 F.Supp. at 864–867. For purposes of the Court's rulings on the pending motions, those background facts need not be repeated here except as any such additional facts may otherwise be relevant to the issues raised by the pending motions. At the trial, both sides called many witnesses, and numerous exhibits were admitted in evidence.[2] At the close of plaintiffs' case, defendants filed a motion for judgment as a matter of law pursuant to Rule 50(a), F.R.Civ.P. That motion was granted in part and denied in part. The Court concluded that there was "just barely" enough evidence for submission of plaintiffs' § 10(b) and Rule 10b–5 claims to the jury. However, the Court concluded that plaintiffs had not met their burden of proving the elements of a claim of fraud under Maryland law.

At the close of all the evidence, plaintiffs moved under Rule 50(a) for judgment as a matter of law, and defendants renewed their

---

1. The parties agree that a new trial should be scheduled if both plaintiffs' and defendants' post-trial motions are denied.

2. The entire trial proceedings have been transcribed, and the Court has had the benefit of reviewing the transcripts and in particular those portions relied upon by counsel in their memoranda.

motion for judgment as a matter of law. Both motions were denied by the Court. The case was then presented to the jury under lengthy instructions from the Court. When the jury could not agree on a verdict, a mistrial was declared.

## II

### *Applicable Legal Principles*

■ It is well established that Rule 50(b) permits the filing by a party of a renewed motion for judgment as a matter of law in the event that a mistrial has been declared. *DeMaine v. Bank One Akron, N.A.*, 904 F.2d 219, 220–221 (4th Cir.1990). Rule 50(b) specifically provides that if no verdict was returned by a jury, the Court may, in disposing of a renewed motion, "direct the entry of judgment as a matter of law or may order a new trial."

■ In ruling on a motion for judgment as a matter of law, the trial court should consider the record as a whole viewing the evidence presented in the light most favorable to the party against whom the motion is made. *Marder v. G.D. Searle & Co.*, 630 F.Supp. 1087, 1088 (D.Md.1986), *aff'd without op., sub nom., Wheelahan v. G.D. Searle & Co.*, 814 F.2d 655 (4th Cir.1987). When the evidence is viewed in such a light, judgment should be entered notwithstanding the jury's failure to reach a verdict if insufficient evidence was presented to support a verdict for the nonmoving party. *Id.* at 1089. A district court should enter judgment as a matter of law in favor of a defendant if the plaintiff has failed to produce substantial evidence in support of its claim. *DeMaine*, 904 F.2d at 220; *Business Dev. Corp. v. United States*, 428 F.2d 451, 453 (4th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970). Speculative or conjectural inferences are not sufficient to support a verdict in favor of a party opposing a motion for judgment as a matter of law. *Business Dev. Corp.*, 428 F.2d at 453. More than a scintilla of evidence is required. *Mann v. Bowman Transp., Inc.*, 300 F.2d 505, 510 (4th Cir. 1962). An issue may be removed from the jury if evidence provides a mere "possibility" yet not a "probability" of proof. *Mayberry v.*

*Dees*, 663 F.2d 502, 510 (4th Cir.1981), *cert. denied*, 459 U.S. 830, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982).

■ The claims of plaintiffs which now remain in this case have been brought under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. To establish liability under § 10(b) and Rule 10b–5, a plaintiff must prove: (1) that the defendant made a false statement or omission of material fact; (2) with scienter; (3) upon which the plaintiff justifiably relied; and (4) that proximately caused the plaintiff's damages. *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir.1994); *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1260–61 (4th Cir.1993). *Accord Malone v. Microdyne Corp.*, 26 F.3d 471, 476 (4th Cir.1994); *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir.1991); *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991), *cert. denied sub nom., Schatz v. Weinberg & Green*, 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992).

The dispute here is based essentially on plaintiffs' contention that defendants omitted to state material facts which they had a duty to disclose under federal law. In its Opinion of May 23, 1994 in *PPM America II*, this Court discussed at some length the materiality requirement of a claim asserted under § 10(b) and Rule 10b–5. Very recently, the Fourth Circuit has had occasion to consider these principles in *Hillson Partners*, an Opinion authored by Circuit Judge Diana Motz and filed on December 13, 1994. In summarizing those principles in a more succinct manner than did this Court in *PPM America II*, Circuit Judge Motz said the following:

> The critical concern in the case at hand is the first of these factors, which itself has two components: (a) a false statement or omission of a fact (b) that is material. In *Basic, Inc. v. Levinson*, 485 U.S. 224 [108 S.Ct. 978, 99 L.Ed.2d 194] (1988), the Supreme Court set forth the starting point for any analysis of this factor. There the Court devoted much of its attention to the "materiality requirement" and held that in order "to fulfill the materiality requirement" in the § 10(b) and Rule 10b–5 context "there must be a substantial likelihood

that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231–32 [108 S.Ct. at 983] (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 [96 S.Ct. 2126, 2132, 48 L.Ed.2d 757] (1976)). Thus, materiality is a "fact-specific inquiry," which "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id.* [485 U.S.] at 240 [108 S.Ct. at 988] (footnote omitted). With respect to "contingent or speculative information or events," materiality " 'will depend ... upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' " *Id.* at 238 [108 S.Ct. at 987] (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968) (*en banc*), *cert. denied sub nom., Coates v. SEC,* 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969)).

*Hillson Partners, supra,* at 208–09.

Recognizing that materiality is a fact specific inquiry and that various relevant factors must be balanced, this Court in its charge delivered to the jury in this case on October 17, 1994, said the following, *inter alia:*

> There are numerous factors which you may consider in determining the probability and magnitude of a particular event. A corporation's consideration of a major change in corporate form involving the internal restructuring of the corporation may, depending upon the particular circumstances, be material at an early point in time, even if there is only a probability that the change will occur or if it is merely contingent upon future events. But you should consider other relevant factors. Other factors which you may consider are whether preliminary discussions were speculative and tentative, whether the company's management had taken significant and purposeful action with regard to the transaction, whether the proposal was being considered at the highest corporate levels, whether the details of the proposed transaction had been worked out and

> whether Marriott's board of directors had considered and acted on the plan or proposal. No one of these factors is conclusive.

> Whether discussion of plans or proposals for internal restructuring are material depends on all the facts. Generally, in order to assess the probability that an event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels.

> I repeat: No single factor is determinative; all relevant factors must be considered and balanced to determine the issue of materiality.

The parties have not objected to this summarization of the factors which pertain in this case to a determination of materiality. In its rulings on the pending motions, the Court will accordingly be guided by the principles of law enunciated in *Hillson Partners* and other pertinent Fourth Circuit cases and in the aforementioned portion of the Court's charge to the jury in this case.

### III

### *Defendants' Renewed Motion for Judgment as a Matter of Law*

In support of their Rule 50(b) motion, defendants contend that the evidence presented at the trial was insufficient as a matter of law to satisfy all four of the elements of the claims asserted by plaintiffs under § 10(b) and Rule 10b–5. It is argued that no rational jury could find on the evidence presented at the trial (1) that defendants made any omissions or false or misleading statements of material fact in connection with the April or later bond sales; (2) that defendants acted with scienter prior to the April bond sales or thereafter; (3) that plaintiffs actually relied on defendants' alleged omissions or false statements; and (4) that plaintiffs suffered any recoverable damages under § 10(b) and Rule 10b–5.

In opposing defendants' motion, plaintiffs, *inter alia,* have relied on prior rulings of the Court made both before and during the trial. The Court did indeed decline to enter judgment in favor of defendants during pretrial proceedings and during the trial. However,

the record before the Court when it denied defendants' motion for summary judgment in *PPM America II* was quite different from that which was presented at the trial.[3]

Moreover, in denying defendants' Rule 50(a) motion made at the close of plaintiffs' case, the Court indicated its belief that plaintiffs had not presented strong evidence of their claims for damages under § 10(b) and Rule 10b–5 based on bonds purchased in April of 1992 and thereafter.[4] Noting that plaintiffs' case was a circumstantial one, the Court concluded that there was "just barely" enough evidence for the submission of plaintiffs' claims to the jury. After hearing argument from counsel on defendants' initial Rule 50(a) motion, the Court determined that there was more than a scintilla of evidence presented on the essential issues, "albeit not a great deal more than a scintilla." In later denying motions for judgment as a matter of law made by both sides at the close of all the evidence, the Court decided to submit all the remaining issues to the jury before considering as a matter of law whether one side or the other should prevail. It is only now, after a lengthy trial and after the Court has had the opportunity to consider the entire record and extensive briefing of the post-trial motions, that the Court has a full comprehension of the nature of the evidence relied upon by plaintiffs in support of their circumstantial case.

■ In any event, the mere fact that a trial judge has denied motions for judgment made during the trial does not prohibit the granting of post-trial motions seeking that same relief. In *Marder*, Judge Young of this Court denied defendants' motion for a directed verdict at the close of plaintiffs' case as to all issues except for plaintiffs' fraud claims. 630 F.Supp. at 1088. After three weeks of trial, the case was submitted to the jury, and when the jury failed to agree on the verdict,

the Court declared a mistrial. *Id.* Concluding that the case dealt with mere possibilities rather than probabilities and that plaintiffs' proof was merely theoretical, Judge Young granted defendants' post-trial motion for judgment as a matter of law filed pursuant to Rule 50(b). *Id.* at 1095. The Fourth Circuit affirmed without issuing a written opinion. *See Wheelahan v. G.D. Searle & Co.,* 814 F.2d 655 (4th Cir.1987) (table).

Following a careful review of all the evidence produced at the trial in this case, the Court has concluded that plaintiffs have failed to satisfy their burden of proving several essential elements of their § 10(b) claims.

(a)

*April Sales—Materiality*

In the latter part of April, 1992, Marriott issued $400 million face value of Series L and Series M bonds. The initial public offerings of the Series L and Series M bonds (hereinafter the "IPOs"), which were issued respectively on April 22, 1992 and April 28, 1992, were made through various underwriters. Plaintiffs, which were purchasers of $85 million of Marriott bonds between April 9, 1992 and September 2, 1992, contend that Marriott had a duty, before the IPOs in April and thereafter, to disclose to the public that it was considering the possibility of splitting the company into two parts.[5]

To meet its burden on the issue of materiality, plaintiffs rely essentially on the following contentions: (1) that Marriott hired Stephen F. Bollenbach in early 1992 as its Chief Financial Officer ("CFO") for the specific purpose of restructuring the company; (2) that Bollenbach had been CFO of Holiday Corporation from 1986 through 1990 and had implemented a restructuring of that corporation which had included a split-up; (3) that an internal memorandum of Marriott dated

---

**3.** *Inter alia,* counsel for plaintiffs conceded during the trial that defendants were not required under applicable law to disclose Code Red.

**4.** In *PPM America I,* the Court had dismissed claims of plaintiffs based on bonds purchased in January and February of 1992. 820 F.Supp. at 979.

**5.** At various times during this litigation, counsel for plaintiffs have presented different characterizations of what defendants should have disclosed to investors. Most recently, during argument on the pending motions, plaintiffs' counsel asserted that prior to the April IPOs, defendants had a duty "to tell the investors that there was under consideration the possibility of splitting Marriott in two."

March 6, 1992 included as a possible future strategy a split-up of Marriott into component parts; (4) that between January and April of 1992, Marriott representatives considered the project known as "Code Red"; and (5) that in a memorandum of April 16, 1992 from Bollenbach to J.W. Marriott, Jr.,[6] Bollenbach had outlined his objectives as CFO for the year 1992. Counsel for plaintiffs have conceded that none of these events should have been separately disclosed to investors before the April bond sales. However, it is argued that when this circumstantial evidence is considered in its totality, a rational jury could find that defendants had under consideration before late April of 1992 the possibility of splitting the company into two parts, one to own Marriott's lodging and services operations and the other to own its real estate properties. According to plaintiffs, that possibility constituted a material event which should have been disclosed to plaintiffs and other investors before they purchased Marriott bonds in April of 1992.

A close and critical look at each of the events relied upon by plaintiffs indicates that, whether considered separately or in the aggregate, they do not constitute substantial evidence that a material event occurred before the bond sales in April of 1992 or thereafter. Plaintiffs have here attempted to weave together a series of diverse events to create the unwarranted inference that Marriott had under active consideration before late April of 1992 a plan, which later became Project Chariot, to split the company into two separate parts. Plaintiffs' assumptions are flawed. A party cannot create an issue of fact for trial by the building of one inference upon another. *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985); *Cooke,* 998 F.2d at 1260.

There is no indication in the evidence that Bollenbach was hired for the express purpose of devising a plan to split-up Marriott. William Shaw was Marriott's CFO from April of 1988 until February of 1992. Shaw testified that in early 1992 he was promoted to the position of President of the services

group of Marriott. Bollenbach, who had earlier been Marriott's Treasurer, was hired to replace Shaw and fill the open position of CFO. That Bollenbach had previously been CFO of Holiday and had participated in a restructuring of that corporation two years earlier is hardly proof that when he came to work for Marriott he had firmly in mind a plan to split Marriott in two. There is no evidence that CEO J.W. Marriott, Jr. even knew the details of the Holiday restructuring when Bollenbach was hired. But even if he did, the evidence discloses that the Holiday transaction was markedly different from Project Chariot. What occurred at Holiday was essentially a sale rather than the split-up Transaction which was finally announced by Marriott on October 5, 1992.

On March 6, 1992, Matthew J. Hart, Marriott's Treasurer, sent a memorandum to Bollenbach. That document hardly constitutes evidence of a material event which should have been disclosed to investors. The memorandum outlined three possible future strategies to be considered by Marriott and named the individuals assigned to analyze each one. It stated as follows:

1. *Grind it out* (Carolyn Handlon)—Continue to sell assets at or above present value of holding. Pay down the debt to improve credit rating, balance credit needs with desire to maximize E.P.S.

2. *Split-up* (David Chichester)[7]—Divide company into component parts—asset based and service based. Capital structure would follow.

3. *Hold 'Em* (Ray Murphy)—Withdraw from active efforts to dispose of real estate until market improves. Replace 'relationship' lenders with generic funding and ride out the storm.

The individuals assigned to consider each of these possible strategies were not high ranking executive officers. This memorandum thus does not disclose that officers at a high corporate level were seriously considering the splitting of Marriott into two parts. The corporate musings evidenced by the

---

6. At all relevant times, defendant J.W. Marriott, Jr. was both Marriott's Chief Executive Officer ("CEO") and Chairman of its Board of Directors.

7. Chichester had the title of Marriott's Vice President of Project Finance.

Hart memorandum did not constitute the sort of information which would have been viewed by a reasonable investor as having significant value. As Circuit Judge (now Justice) Breyer said in *Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 415 (1st Cir. 1989), for large corporations to make public announcements every time vague proposals of the sort involved here were discussed "would more likely confuse, than inform, the marketplace."

Nor for similar reasons did Bollenbach's memorandum of April 16, 1992 constitute evidence that Marriott had under active consideration a concrete plan for splitting the company into two parts. In that interoffice memorandum sent to J.W. Marriott, Jr., Bollenbach indicated that he had revised his 1992 objectives. Plaintiffs rely on only one of nine separate parts of that four-page memorandum, as follows:

VII. Revise "Marriott Story"

Lead an effort to review and re-evaluate Marriott Corporation financial and operational strategy for the 1990's.

During the 1980's the company relied on creating shareholder value by accomplishing a specified growth rate and return on equity.

The method of achieving growth (Hotel development and acquisition of service businesses and the creation of some business de novo) in the 1980's is not applicable to the 1990's.

We will need to adopt a different approach to creating shareholder value.

My objective is to secure consensus as to that approach and document that approach.

My objective will be accomplished by the end of the summer.

We will launch an effort in the fall to tell the revised "Marriott Story" to our shareholders and the investment community.

Again, what appears from this memorandum is merely that Bollenbach put down on paper some preliminary ideas that he would be exploring in the future as Marriott's new CFO. There is no mention in the memorandum of a split-up nor any indication that Bollenbach had in mind a well-formulated plan for restructuring Marriott. His generalized ideas obviously had little form or substance and were not the sort of information which a reasonable investor would have viewed as significantly altering the total mix available.

Facts pertaining to Code Red have even less relevance to the issue of materiality here. Early in 1992, Chichester and Scott Laporta[8] worked with analysts from First Boston Corporation on a project which came to be known as "Code Red." The Code Red proposal was not in any way Bollenbach's idea but was initially conceived by First Boston before Bollenbach became the CFO of Marriott. At the meeting held on April 3, 1992 attended by Bollenbach, Hart and numerous First Boston personnel, the proposal was considered and shortly thereafter was rejected *in toto*. It is apparent from the evidence that the whole concept of Code Red was totally different from what eventually became Project Chariot.[9] Although conceding that Code Red was not deemed to be something which Marriott wished to pursue, plaintiffs nevertheless argue that, since one of the aspects of the Code Red plan was a separation of Marriott's real estate holdings from its other operations, Code Red was an earlier version of Project Chariot. Relying on this single feature of this rejected proposal, plaintiffs contend that evidence pertaining to the development of the Code Red project constitutes affirmative proof of a plan to split the company into two parts. The inference which plaintiffs seek to derive from the Code Red circumstances is unfounded and amounts to no more than speculation.

Evidence does not exist in this record indicating that Bollenbach conceived of the idea to split the company into two parts on a date before that when he said the idea occurred to him. His testimony at the trial was that the idea first came to him on the weekend of

---

**8.** Laporta had the title of Manager of Financial Planning and Analysis and later Director of Financial Planning and Analysis.

**9.** Indeed, had the Code Red plan been implemented, Marriott's bond holders would have benefitted.

May 2–3, 1992. Significant evidence of record corroborates Bollenbach's testimony. William Kafes, a Vice President and Associate General Counsel of Marriott, testified that he first learned of the idea from Bollenbach on May 4, 1992, and J. Willard Marriott, Jr. testified that he first learned of it on May 7, 1992. No evidence was presented to indicate that any senior officer or director of Marriott ever heard before May 2 of Bollenbach's idea of splitting the company into two parts. The evidence here does not support plaintiffs' contention that the Bollenbach concept to split the company was "rooted" in two months of consideration.

■ Plaintiffs argue that Bollenbach cannot be believed and suggest that the jury would therefore be entitled to draw an adverse inference supporting plaintiffs' contentions. According to plaintiffs, Bollenbach's testimony was not "remotely plausible," and plaintiffs argue that Bollenbach chose the May 2, 1992 date with the devious intention of avoiding the requirements of § 10(b). Certainly, the jury, in assessing the credibility of the witnesses, would be entitled to reject Bollenbach's testimony. But such rejection would not supply the missing proof. Plaintiffs bear the burden of proof in this case and cannot create an issue for the jury's resolution by relying merely on the hope that the jury will not trust the credibility of defendants' witnesses. *Flynn v. Goldman, Sachs & Co.*, 836 F.Supp. 152, 154 (S.D.N.Y. 1993). Plaintiffs must produce "affirmative evidence" that the claimed material event occurred before April of 1992. *Id., citing Martin v. Citibank, N.A.*, 762 F.2d 212, 217 (2d Cir.1985), *quoting* 9 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2527 at 563 (1st Ed.1971).

In relying on various diverse incidents and internal Marriott memoranda between January and April of 1992, plaintiffs prove too much. The Hart memorandum, the Bollenbach memorandum and the Code Red study, considered in the aggregate, disclose that Marriott officials were not at the time focusing on any particular plan to split the company into two parts. Rather, Marriott was during this period considering various possible alternative strategies for the future, none of which were more than vague and unformulated concepts.[10] In *TSC Industries,* 426 U.S. at 448, 96 S.Ct. at 2132, the Supreme Court cautioned that disclosure policies under federal securities laws are not without limits. If "the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements," but also shareholders would be buried by "an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *Id.* at 448–49, 96 S.Ct. at 2132.

When each of the factors which were mentioned in the Court's charge and which relate to a determination of the probability and magnitude of a particular event are considered in the light of the record here, they all favor the position taken by defendants in this case on the issue of materiality. Marriott's consideration between January and April of 1992 of new strategies for the future was speculative and tentative. No significant and purposeful action was taken by the company's top management during this period with regard to the splitting of the company into two parts. Preliminary proposals for possible restructuring were not then being considered at the highest corporate levels. None of the details of a proposed split-up had been worked out before late April of 1992, and Marriott's Board of Directors had not before that date either considered or acted on any possible plans or proposals. Moreover, there is no evidence in the record indicating that before the April bond sales, Marriott had made a decision to change its historical operating strategy of developing and selling real estate and retaining long term management contracts.

Instructive under the circumstances here is the Fourth Circuit's Opinion in *Taylor v. First Union Corp.*, 857 F.2d 240 (4th Cir. 1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989). In that case,

---

10. There is no merit to plaintiffs' contention that Marriott was facing "disaster" and a "crisis" in January of 1992. This specious suggestion is based on certain isolated, handwritten notes affixed to a draft of an interoffice memorandum dated January 24, 1992.

the plaintiff sought a recovery under § 10(b) and Rule 10b–5 based on defendant's alleged failure to disclose certain merger discussions and other conduct surrounding the purchase of plaintiff's stock. *Id.* at 242. Following a mistrial and a retrial, the jury returned a verdict against the defendant. After the trial judge had denied its motion for judgment n.o.v. or for a new trial, defendant appealed. In an Opinion authored by Circuit Judge Wilkinson, the Fourth Circuit reversed and remanded for entry of judgment in favor of the defendant. 857 F.2d at 247.

Noting that "[n]ot every such business conversation gives rise to legal obligations," the Court found from the evidence that the discussions at issue in that case were preliminary, contingent and speculative. *Id.* at 244. Neither the factual nor the legal predicates for a merger were shown by the evidence to be in place and there was no evidence of board resolutions. *Id.* The Court went on to say:

> ... the more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision. Information of speculative and tentative discussions is of dubious and marginal significance to that decision. To hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to "bury the shareholders in an avalanche of trivial information"; the very perils that the limit on disclosure imposed by the materiality requirement serves to avoid. *See* [*TSC Industries,* 426 U.S. at 448–49, 96 S.Ct. at 2132]; *Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075, 1085–86 (5th Cir.1970).

*Taylor,* 857 F.2d at 244–45.

In *Hillson Partners,* which involved questions concerning a company's obligation to disclose statements as to its future business prospects, Circuit Judge Motz said the following:

> As we noted in *Raab,* [*v. General Physics Corp.,* 4 F.3d 286 (4th Cir.1993) ], imposing liability on companies for predictions of future growth, which are often and inevitably wrong, would lead to the further prolif-

eration of lawsuits and would be contrary to the "goal of full disclosure underlying the securities laws." *Raab,* 4 F.3d at 290.

*Hillson Partners, supra,* at 220 (footnote omitted).

The *Taylor* and *Hillson Partners* principles are equally applicable here. Were these preliminary, unformed proposals for the future restructuring of Marriott deemed to be material under federal securities laws, shareholders would be buried in an avalanche of similar trivial information, contrary to the goal of full disclosure underlying these laws.

Relying on *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726 (2d Cir.1987), *cert. denied sub nom., Trans World Airlines, Inc. v. Kronfeld,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988), plaintiffs argue that, in cases involving internal restructuring, consideration of a new corporate structure becomes material at an earlier point in time. In its Opinion in *PPM America II,* this Court cited and applied certain principles adopted by the Second Circuit in *Kronfeld.* The Court's research does not indicate that the Fourth Circuit has ever cited *Kronfeld,* much less adopted its reasoning with approval. Opinions like *Taylor* and *Hillson Partners* suggest that the Fourth Circuit would not be inclined to read § 10(b) and Rule 10b–5 as broadly as has the Second Circuit. In any event, even were *Kronfeld* to be adopted as law in the Fourth Circuit, the Court's ruling here would be the same. Assuming that a reasonable investor would give greater weight to early signs of an internal restructuring than to early signs of a merger, the evidence in this case is still insufficient to support plaintiffs' contention that a material event occurred before the April bond sales.

For these reasons, this Court concludes as a matter of law that as to the April bond sales plaintiffs have not met their burden on the issue of materiality.

(b)

*Sales During the Summer—*
*Duty to Disclose*

As he testified at the trial, Bollenbach thought of the idea of splitting Marriott into two parts on the weekend of May 2–3, 1992. When he mentioned this concept to J.W.

Marriott, Jr., the latter suggested that he present the idea to the Board of Directors at the scheduled June 4, 1992 meeting and that he discuss the concept individually with Board members prior to that meeting. At the June 4 meeting, the Board authorized Bollenbach to retain advisors and further examine his concept. He was directed to report back to the Board on the matter at its August 6, 1992 meeting. James D. Wolfensohn, Inc., an investment banking firm (hereinafter "Wolfensohn"), was hired to give advice concerning the ultimate form of the proposal and to render a fairness opinion. Glen Lewy of Wolfensohn described the idea initially presented to him by Bollenbach as "a very amorphous inchoate concept." At the August 6 meeting, the Board heard presentations from the independent experts who had been working with Bollenbach on Project Chariot. Further consideration and development of the plan was then authorized by the Board. During the summer, various drafts of documents were prepared relating to the corporate structures which would ultimately be formed. The final form of the Transaction was not agreed upon until late September. The Board approved the fully formulated plan on October 4, and Marriott made its formal announcement on October 5.

Some of plaintiffs' purchases of Marriott bonds occurred between May and October of 1992. Plaintiffs have in the alternative here claimed that because of the discussions and events which occurred during the summer of 1992, defendants are not entitled to judgment as a matter of law as to purchases of bonds made on or after June 4, 1992 or as to purchases of bonds made on or after August 6, 1992. In opposing these alternative contentions, defendants have argued that they had no duty to disclose the events which occurred during the summer of 1992 and that these events were not material.

■ Insofar as all of plaintiffs' claims based on alleged omissions of material fact are concerned, including the alleged omissions during the summer of 1992, plaintiffs must prove, *inter alia*, (1) that defendants omitted a material and misleading fact and (2) that defendants were under a "duty to disclose" the omitted fact. *Taylor*, 857 F.2d

at 243. Defendants argue that if, as the Court has determined here, plaintiffs have not satisfied their burden of proving materiality as to the events occurring before late April of 1992, defendants had no duty to disclose events occurring during the summer of 1992. The Court would agree.

■ Plaintiffs' alternative claims based on purchases during the summer of 1992 rest on the contention that Marriott had a duty to update or correct previous disclosures made at or before the date of the IPOs. According to plaintiffs, even if prior disclosures were not materially false or misleading, defendants should have updated the information provided because of what occurred at the various board meetings in June and August of 1992 and because of other events which occurred during the summer. It is well established, however, that, for there to be liability under 10b–5 for omissions or non-disclosures, a duty to speak must exist. *Walker v. Action Indus.*, 802 F.2d 703, 706 (4th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987); *Hillson Partners, supra*, at 219. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic*, 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17.

In concluding in *Hillson Partners* that, even "[a]ssuming that there can ever be a 'duty to update'," no duty to disclose existed under the facts of that case, Circuit Judge Motz said the following:

> Liability under § 10(b) and Rule 10b–5 stems from an omission or misrepresentation of material fact upon which a reasonable investor might have relied; where there has been no such omission or misrepresentation, there can be no further obligation to update because, almost by definition, such disclosure would not significantly alter the total mix of available information. To require Adage continually to correct and modify its projections would inevitably discourage the types of disclosure the securities laws seek to encourage. *See Raab*, 4 F.3d at 290. As we explained in *Walker*, in determining whether a corporation need *ever* disclose economic projections:

Because of the frequency and volatility of these projections, the imposition of a duty to disclose them would have required virtually constant statements by [the issuer] in order not to mislead investors. Under these circumstances, we deem the projection disclosures urged by [appellant] to be impractical, if not unreasonable.

*Hillson Partners, supra,* at 219.

Applying these principles here, this Court concludes that defendants had no duty during the summer of 1992 to update any prior disclosures. Plaintiffs have not proven that before April of 1992 there were omissions or misrepresentations of material fact upon which a reasonable investor might have relied. Under the circumstances here, Marriott was not required to continuously update prior available information and disclose the diverse events which occurred at the June 4, 1992 meeting, at the August 6, 1992 meeting or at other times during the summer of 1992 when there was further consideration of and changes to Bollenbach's original split-up concept.

At the June 4 meeting, the Board took no action other than to authorize Bollenbach and others to examine and study the new idea for the restructuring of the company. Significant changes were made during the summer of 1992 in the form of the concept, and the final form of the Transaction was strikingly different from Bollenbach's original idea. Various steps were taken during the summer in an effort to structure the Transaction so that Host Marriott would be able to meet all of its debt obligations when they became due.[11] It was decided during this period of time that the travel plazas businesses and the Host business, including concession operations at airports and highways, should be transferred to (in effect retained in) Host Marriott. These businesses generated annual revenues of approximately $1 billion a year.

Later, in September, it was decided that a line of credit in the amount of $600 million should be made available from the new Marriott International to Host Marriott. This was a controversial idea. Discussions as to the necessity for and the terms of this latter feature of the Transaction continued until mid-September. At one critical point during that month, it appeared that the Transaction would not go forward because Wolfensohn did not believe that, under the then existing terms of the line of credit, it could give a fairness opinion. Following further discussions, final agreement on the terms of the line of credit was reached, and the Transaction in final form was presented to the Board for approval at its October 4 meeting. Had federal securities law imposed upon Marriott a duty to disclose the various different conceptual forms of Project Chariot under study and revision during the summer of 1992, Marriott would have virtually been required to issue weekly updated statements to investors.

Accordingly, this Court concludes as a matter of law that as to the purchases of bonds made by plaintiffs between May and October of 1992, defendants had no duty to disclose its consideration of plans to split Marriott into two parts.[12]

### (c)

### *Scienter*

Besides proving materiality, plaintiffs also have the burden, as to all of their purchases, of proving that defendants acted with scienter. The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). Proof of recklessness is sufficient to fulfill the scienter requirement in a Rule 10b–5 action. *Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 464 F.Supp. 528, 537 (D.Md.1978). Conduct not involving manipulation or deception is not

---

11. Marriott Corporation was to be re-named "Host Marriott Corporation," and that entity would own the bulk of Marriott's real estate properties and be responsible for Marriott's long term debt, including the bonds purchased by the plaintiffs.

12. Since the Court has concluded that Marriott had no duty to disclose events occurring during the summer of 1992, it is not necessary to consider whether or not the events in question were material.

actionable under § 10(b). *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977). Reckless behavior has been defined by the Seventh Circuit as conduct which is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied sub nom.*, *Meers v. Sundstrand Corp.*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).

When these principles are applied to the facts of record here, this Court concludes that plaintiffs have not met their burden of proving that defendants acted with scienter. It was not reckless for J.W. Marriott, Jr. and the other Marriott officers to fail to disclose to investors before April of 1992 that there was a possibility that the company would be split into two parts. It could not have been obvious to these defendants that purchasers of bonds would be misled by such a nondisclosure. It was therefore not reckless behavior to fail to disclose to investors discussions concerning contingent and unformulated plans relating to the company's future operations. The same is true as to events occurring during the summer of 1992. Since the essential elements of the Transaction had not as yet been worked out during that summer, defendants were not reckless in failing to disclose the details of their preliminary review of and discussions concerning the project.

As circumstantial evidence constituting proof of scienter, plaintiffs rely on the fact that Bollenbach and the Marriott family owned 25% of Marriott's common stock, that the price of the stock had been depressed in 1992 and that defendants had a motive to increase the price of Marriott's stock when it considered the approval of the Transaction. However, it is not disputed in this case that, absent a violation of § 10(b), no federal or state laws were violated when Project Chari-

ot became effective.[13] That the Marriotts and Bollenbach expected the price of the bonds to fall and the price of the stock to increase after the effective date of Project Chariot, is hardly proof that they acted recklessly in failing to disclose at an earlier date their preliminary consideration of the form of the proposal. Indeed, had they been motivated solely by an intention to drive up the price of their stock, an earlier rather than a later disclosure of the plan would have been of greater financial benefit to the stockholders.

For these reasons, this Court concludes as a matter of law that, as to all the bond sales at issue in this case, plaintiffs have not met their burden on the issue of scienter.

### (d)

### *Damages*

The eleven remaining plaintiffs in this case are here seeking compensatory damages in the amount of some $18,175,437. Plaintiffs' claims for damages are based solely and *in toto* on the testimony of their expert witness, Dr. Roger Ibbotson. Defendants contend that no rational jury could find on the evidence presented that plaintiffs have suffered any damages cognizable under Rule 10b–5. The Court would agree.

It is well settled that in a case of this sort the proper measure of the damages sustained by a defrauded buyer is that buyer's "out-of-pocket loss." *See e.g., Randall v. Loftsgaarden*, 478 U.S. 647, 662, 106 S.Ct. 3143, 3152, 92 L.Ed.2d 525 (1986); *Occidental Life Ins. Co. v. Pat Ryan & Assocs., Inc.*, 496 F.2d 1255, 1264 n. 5 (4th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 576–78 (2d Cir.), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982). *See generally*, IX L.Loss & J. Seligman, *Securities Reg.* 4413–15 & n. 503 (3d ed. 1992). "Under this measure of damages, a defrauded buyer can recover the value of the consideration he paid for the security less the actual value of the security

---

**13.** As the jury was instructed, it was not being asked to decide whether the transaction was or was not fair for bondholders but only whether there had been a violation of § 10(b) and Rule

10b–5. There was no claim in this case of a breach of the indentures pursuant to which the bonds were issued.

he received, all measured at the time of the transaction." *In re LTV Securities Litigation,* 88 F.R.D. 134, 148 (N.D.Tex.1980); *accord Occidental Life,* 496 F.2d at 1264 n. 5; *In re VMS Securities Litigation,* 136 F.R.D. 466, 482 (N.D.Ill.1991).

Dr. Ibbotson based his calculations of plaintiffs' damages solely on the bond market's "reaction" to the announcement of the Transaction, measured by the decrease in the prices of Marriott bonds which occurred between October 5 and October 9, 1992. Dr. Ibbotson's entire theory of damages was based on his assumption that Marriott could have made the same disclosure in April of 1992 and thereafter during the summer that it later made on October 5, 1992. Clearly, the facts of record do not support this fundamental assumption.

 What was announced in October of 1992 was a transaction which was totally different from one that could possibly have been disclosed in April of 1992 or thereafter during the summer. A defrauded buyer's loss must be measured at the time of the purchase. Plaintiffs in this case were therefore required to prove that defendants' alleged omissions and misrepresentations artificially "inflated" the market price of Marriott bonds over and above the "true" or "real" value of the bonds *at the time of the purchases of the bonds by plaintiffs. See Huddleston v. Herman & MacLean,* 640 F.2d 534, 556 (5th Cir. Unit A Mar. 1981), *aff'd in part and rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

During his testimony, Dr. Ibbotson acknowledged that any disclosure by defendants of their consideration of split-up proposals made at any time between April and October would not be the same announcement which was made on October 5, 1992. In an attempt to bolster his testimony, Dr. Ibbotson stated that an unformulated announcement by Marriott in April of 1992 of the proposed project would "have the same effect as a completed announcement with all the terms." This suggestion amounts to pure speculation. Although bond prices might very well have dropped as a result of a generalized disclosure made before the April dates or before the later dates during the summer, it could hardly be assumed, in view of the differences in the disclosures which would be made at such times, that the drop would be exactly the same as that which occurred shortly after October 5, 1992.

Plaintiffs contend that various courts have recognized that damages in a § 10(b) case may properly be based on market reaction. *See e.g., Harris v. American Inv. Co.,* 523 F.2d 220, 228 (8th Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). However, the fact that the market reacted to the announcement on October 5, 1992 of a well-formulated plan for the restructuring of Marriott does not indicate that the reaction would have been the same some five months earlier on disclosure of the possibility of a future split-up of the company. Indeed, the very term "split-up" itself is a somewhat broad and amorphous concept. As Dr. Ibbotson himself testified, "the term split-up is not typically well-defined," has "no clear-cut definition" and "means pretty much whatever you think it means ..."[14]

 Similarly, Dr. Ibbotson provided no basis for his calculation of the damages suffered by the plaintiffs who purchased their bonds in the summer of 1992. The Transaction which was eventually announced on October 5, 1992 had been the subject of various changes and permutations during the preceding months. The opinion of Dr. Ibbotson presented to the jury was not in any way based on the artificial inflation of the market caused at the time of plaintiffs' purchases by the omissions relied upon. Where, as here, the opinion of a plaintiff's expert in a § 10(b) case amounts to no more than speculation, the defendant's motion for judgment as a matter of law may properly be granted. *Feldman v. Simkins Indus., Inc.,* 492 F.Supp. 839, 847–48 (N.D.Cal.1980), *aff'd,* 679 F.2d 1299 (9th Cir.1982); *see also Feldman v. Pioneer Petroleum, Inc.,* 813 F.2d 296, 302 (10th Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).

---

**14.** Many witnesses described the Marriott Transaction as essentially a "spin-off."

For these reasons, the Court concludes as a matter of law that as to all of the bond sales at issue here, plaintiffs have not met their burden of proving that they sustained compensable damages.[15]

### IV

*Plaintiffs' Motion for Judgment as a Matter of Law or for a New Trial*

In their post-trial motion, plaintiffs seek the following alternative forms of relief: (1) judgment as a matter of law on all of plaintiffs' claims; (2) alternatively, judgment as a matter of law on all of plaintiffs' claims arising from purchases made on or after June 4, 1992; (3) alternatively, judgment as a matter of law on all of plaintiffs' claims arising from purchases made on or after August 6, 1992; (4) alternatively, judgment as a matter of law on the element of reliance; and (5) alternatively, a new trial.

Plaintiffs' motion concerns issues identical to those addressed by defendants' renewed motion for judgment as a matter of law. As more fully discussed hereinabove, the Court has determined on the record here that plaintiffs are not as a matter of law entitled to a recovery from defendants under § 10(b) and Rule 10b-5. For the same reasons, plaintiffs' motion for judgment as a matter of law or for a new trial must be denied. Judgment will therefore be entered in favor of defendants, with costs.

### V

*Conclusion*

For all the reasons set forth herein, this Court will grant defendants' renewed motion for judgment as a matter of law and will deny plaintiffs' motion for judgment as a matter of law or for a new trial. An appropriate Order will be entered by the Court.

---

15. In view of the Court's rulings on the issue of materiality, on the issue of duty to disclose, on the issue of scienter and on the issue of damages, it is not necessary to consider whether plaintiffs have proved reliance and whether plaintiffs have shown that the individual defendants were controlling persons under § 20 of the Securities Exchange Act of 1934.