**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**ORKIN EXTERMINATING CO., Defendant.**

**No. Civ. AMD 98–500.**

United States District Court, D. Maryland.

Sept. 1, 1999.

Barbara DeShona Brice–Brown, Mark Guberman, Equal Employment Opportunity Commission, Washington, DC, for plaintiff.

Stephen D. Shawe, Ezizabeth Torphy–Donzella, Shawe & Rosenthal, Baltimore, MD, for defendant.

### MEMORANDUM

DAVIS, District Judge.

The Equal Employment Opportunity Commission ("EEOC") brought this action against Orkin Exterminating Company ("Orkin"), alleging that Orkin discriminated against Emmanuel Nwabugwu ("Nwabugwu") on the basis of race and national origin when it failed to place him in its Branch Manager Training Program. A five day jury trial was held during the week of June 7, 1999. The jury failed to reach a unanimous verdict and on June 14, 1999, I declared a mistrial.

Pending before the Court are Orkin's renewed motion for judgment, pursuant to Fed.R.Civ.P. 50(b), and the EEOC's motion for reconsideration of the Court's dismissal of its punitive damages claim. I have thoroughly reviewed the parties' submissions and no hearing is necessary. *See* Local Rule 105.6 (D.Md.1999). For the reasons discussed below, I will grant Orkin's motion with respect to the race discrimination claim and I will deny its motion with respect to the national origin claim. Furthermore, in light of the Supreme Court's recent decision in *Kolstad v. American Dental Assoc.,* —— U.S. ——, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), I will grant the EEOC's motion to reconsider; thus, the EEOC will be permitted to present its punitive damages claim at the retrial of this case.

### I. FACTS

Nwabugwu is a naturalized American citizen who was born and raised in Nigeria. He came to this country in 1974 to attend college at the University of Nebraska. In 1984, Nwabugwu began working for Orkin, a national pest control and exterminating company, as a termite sales inspector in the Washington, D.C., residential branch.[1] In 1986, Nwabugwu requested a transfer to Orkin's Omaha, Nebraska,

---

1. Orkin is structured into individual branches that are grouped into regions, which are, in turn, part of larger divisions. The layered hierarchy of the company is evident. Each branch employs pest and termite control technicians and inspectors. In addition, each branch has a service manager (who is responsible for hiring and overseeing the work of the technicians), a sales manager and a branch manager; only the larger branches employ a full time sales manager. The branch manager reports to his or her region manager, who reports to the division manager.

branch.[2] He worked at the Omaha branch for a few months until he resigned over a dispute in pay.

Unhappy in Nebraska, Nwabugwu returned to the Washington area in 1987. Orkin rehired Nwabugwu as a sales inspector and in May 1987, promoted him to termite sales manager for the Washington residential branch. Nwabugwu remained at this position until 1990, when he became the branch sales manager, a position in which Nwabugwu supervised all of the sales inspectors for the Washington residential branch. At that time, Nwabugwu's supervisor and branch manager was Jim Cotton, a man with whom Nwabugwu enjoyed a good relationship.

In due course, Nwabugwu expressed an interest in becoming a branch manager and discussed this idea with Cotton. In order to become branch manager, an employee must complete Orkin's Branch Manager Training Program ("BMTP"). The BMTP provides a structure in which the employee obtains experience in all aspects of the Orkin business for a specified period of time.[3] Some elements of the BMTP may be waived if an employee had previously obtained experience in that area; thus, for example, since Nwabugwu had worked for a number of years as a sales manager, his training in that area would likely have been waived, had he been placed in the BMTP.

A branch manager candidate must also undergo a psychological evaluation by an industrial psychology firm that Orkin has used for over 20 years. This firm, Helms, Greco and Whiteneck, evaluates candidates using a variety of measures, including intelligence tests, personality measures, self-descriptive instruments and interviews. The assessments usually last about an hour.

In 1992, Cotton recommended to Larry Gard, his region manager, that Nwabugwu be evaluated by Helms for a branch manager position.[4] Before meeting with Helms, Nwabugwu spoke with Gard. According to Nwabugwu, he and Gard discussed what type of environment Nwabugwu would prefer to work in, whether in a metropolitan or a rural area. Nwabugwu testified that Gard told him that there were certain markets in which Orkin would not place him and specifically gave Forsyth County, Georgia, as an example.[5] Gard testified that it was Nwabugwu who expressed a preference for metropolitan, rather than rural areas, and he did not recall at trial ever mentioning Forsyth County. Gard also stated that it would be beneficial for Nwabugwu to work in service management, since all of his previous experience was in sales.

After speaking with Gard, Nwabugwu met with Dr. Helms for about an hour. Although Dr. Helms normally administers intelligence tests to candidates for the BMTP, he did not give Nwabugwu this assessment.[6] Instead, Dr. Helms reported that "Mr. Nwabugwu has adequate intellectual ability from everything we can determine. Since English is not his native language and he was not educated in America, it would be unfair to test his intellectual ability with our standardized measures." Joint Ex. 1 at 1. Dr. Helms's conclusions in these regards were factually incorrect. Nwabugwu learned both En-

2. Nwabugwu requested the transfer for personal reasons.

3. A branch manager candidate must also attend a three week management development course.

4. According to Nwabugwu, Cotton commented that if promoted to branch manager, Orkin would need to find a branch that suited Nwabugwu's personality. Nwabugwu did not

ask Cotton what he meant by this statement; Nwabugwu assumed that Cotton was referring to race.

5. There are no Orkin branches in Forsyth County, Georgia.

6. Nwabugwu testified that after he filled out a 30–50 item questionnaire, Dr. Helms tore it up and said, cryptically, "let's assume this never happened."

glish and Ibo while growing up in Nigeria and he has a Bachelor's and a Master's degree from the University of Nebraska. In any event, on deposition, Dr. Helms testified that his testing instruments generally underestimate the intelligence of individuals whose primary language is not English, and thus, he does not usually administer or report the results in such instances.

After completing his evaluation, Dr. Helms recommended Nwabugwu for a service management position, in part because of Nwabugwu's demonstrated emphasis on providing high quality service to all customers. *See* Joint Ex. 1 at 3. In commenting on Nwabugwu's communication skills, Dr. Helms stated that "while [Nwabugwu] understands things very clearly, he sometimes doesn't have the words to express himself that well verbally. He speaks with a decided accent and there are times when he is not able to communicate clearly and precisely in a discussion." *Id.* at 2. Dr. Helms further reported that Nwabugwu was "not real good at reading other people. This could be a result of some of the cultural differences or it could just be a part of his make-up." *Id.* at 3. Ultimately, Dr. Helms reported that "it may be at this time not all that likely that he is going to move into branch management unless he can learn to read people better and unless he can be a lot more aggressive than he appears to be now." *Id.*

After reviewing the evaluation, Orkin followed Dr. Helms's recommendation, as it typically relies heavily on such evaluations, and offered Nwabugwu a service manager position. Jay Copen, the regional sales manager, discussed the offer with Nwabugwu. Nwabugwu was reluctant to accept the service manager position unless he also obtained a pay raise and a guarantee that he would be placed in the BMTP by a date certain. Orkin would provide neither. Gard testified that he told Nwabugwu that although Orkin would not guarantee when Nwabugwu would be placed in the BMTP, working as a service manager could only help Nwabugwu, because, in some fashion, he would need to acquire service manager experience in order to become a branch manager. Thus, Gard did not understand why it mattered whether Nwabugwu obtained such experience as a part of the BMTP, or as a separate salaried manager. Nonetheless, Nwabugwu elected to remain a sales manager.

Thereafter, Nwabugwu's branch continued to succeed (to "make its numbers" in the parlance of the profit-obsessed Orkin milieu) until the middle of 1993, when sales began to decline. Sales in the adjacent Virginia branch began to decline as well. Orkin contends that Nwabugwu did not follow Gard's instructions that were designed to improve branch performance. Gard testified that Orkin management was placing considerable pressure on himself and Cotton to turn the sales numbers around. This pressure from the top led to friction between Gard, Cotton and Nwabugwu because over time sales did not improve. As a result of the continued decline in performance, Nwabugwu and Cotton, as well as Gard, were transferred out of the region in May 1994.

After Nwabugwu left the Washington residential branch, Orkin placed him in the service department of the Annandale, Virginia, branch. He began service management training in June 1994, but was removed from the training session after one day.[7] In December 1994, Orkin transferred Nwabugwu, at his request, to the Washington commercial branch, which was located closer to his home in suburban Maryland. There, Nwabugwu worked successfully as sales manager. Unfortunately, however, the branch was experiencing problems in its service department and consequently, in September 1995, Orkin transferred Nwabugwu to a service manager position in the branch. Although another employee was already serving as

7. A complete explanation of this incident was not provided at trial.

service manager, Orkin hoped that employing two service managers would alleviate the problems in the department. The service department did not improve, however, and in October 1995, Orkin removed Nwabugwu from the position. Because there was no longer a sales manager position available at that branch, Orkin offered Nwabugwu a position as a sales inspector. Nwabugwu was extremely upset with this "demotion" and about the negative treatment he believed he was receiving; thus, he resigned from Orkin in November 1995.

Nwabugwu filed his EEOC complaint on June 30, 1994. For unspecified reasons, the complaint floated among various investigators until 1997. The final investigator assigned to the case, Aaron Blight, participated in a series of telephone interviews with Gard, Cotton, and Helms. Blight reported that both Gard and Cotton made comments about Nwabugwu's accent in connection with his likely geographic placement as a branch manager candidate during the interviews. The EEOC instituted this lawsuit in February 1998, seeking approximately $13,000 in back pay, compensatory damages for alleged emotional distress and punitive damages. A five day jury trial was held during the week of June 7, 1999 and on June 14, 1999, I granted a mistrial, in light of the jury's failure to reach a unanimous verdict after extended deliberations.

## II. STANDARDS of REVIEW

### A. Judgment as a Matter of Law

Fed.R.Civ.P. 50(a) provides that if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party." Moreover, "if, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its

request for judgment as a matter of law." Fed.R.Civ.P. 50(b).

In ruling on a motion for judgment as a matter of law, I must view the evidence presented in the light most favorable to the non-moving party, here, the EEOC. *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 181 (4th Cir.1998); *see also PPM America, Inc. v. Marriott Corp.*, 875 F.Supp. 289, 293 (D.Md.1995). However, "more than a scintilla of evidence is required" to prevent an adverse judgment as a matter of law, and "speculati[on] or conjectural inferences are not sufficient." *PPM America, Inc.*, 875 F.Supp. at 293. Ultimately, the EEOC must show that a jury could reasonably return a verdict in its favor. *Gibson*, 160 F.3d at 181; *Whalen v. Roanoke County Bd. of Supervisors*, 769 F.2d 221, 224 (4th Cir.1985). Thus, notwithstanding the jury's failure to reach a verdict, if the evidence presented by the non-moving party is insufficient to support a verdict in its favor, judgment as a matter of law is appropriate. *PPM America, Inc.*, 875 F.Supp. at 293.

### B. Title VII

Title VII provides that "it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... or national origin." 42 U.S.C. § 2000e–2. Two evidentiary paradigms have evolved for a plaintiff to prove his or her Title VII claim: the traditional pretext model, set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny, and the "direct evidence" or "mixed motive" case, originating from *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), as modified by the Civil Rights Act of 1991. *See* 42 U.S.C. § 2000e–2m.

"Pretext cases represent the typical disparate treatment action." *Fuller v. Phipps,* 67 F.3d 1137, 1141 (4th Cir.1995). A plaintiff must satisfy the *prima facie* case set forth in *McDonnell Douglas,* which then shifts the burden of production to the employer to articulate a nondiscriminatory reason for the employment decision. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the employer makes such a showing, the presumption of discrimination drops from the case and the plaintiff must prove that the proffered reason for the employment decision is not credible *and* that the ultimate reason for the employment action was discrimination. *See e.g., Vaughan v. Metrahealth Cos., Inc.,* 145 F.3d 197, 201 (4th Cir.1998). A plaintiff will prevail if he or she can show that a prohibited factor played a determinative role in the employment decision, or that such a criterion was a "but for" cause of the adverse employment action. *See Fuller,* 67 F.3d at 1144 (recognizing that a " 'but for' instruction is an accurate one in pretext cases"); *EEOC v. Clay Printing Co.,* 955 F.2d 936, 940 (4th Cir.1992) ("A plaintiff must demonstrate that but for the employer's motive to discriminate . . . [the] plaintiff would not have been [subject to the adverse employment action].").

In contrast, if a plaintiff demonstrates "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion," he or she will be entitled to a mixed motive instruction. *Fuller,* 67 F.3d at 1142 (citing *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775); *see also Kubicko v. Ogden Logistics Serv.,* 181 F.3d 544 (4th Cir.1999) (reversing a grant of summary judgment for employer

in retaliation case under Title VII because the record contained evidence of a mixed motive). A mixed motive instruction allows a plaintiff to establish an employer's liability if a prohibited criterion "was a motivating factor for any employment practice." 42 U.S.C. § 2000e–2(m). If an employer establishes that it would have made the same employment decision in the absence of the impermissible criterion, however, the plaintiff's remedies are limited. 42 U.S.C. § 2000e–5(g)(2)(B). Moreover, in the Fourth Circuit, not all types of evidence will warrant a mixed-motive instruction. *See Fuller,* 67 F.3d at 1142. Rather, the plaintiff must produce "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.*

In this case, I instructed the jury on the mixed motive theory in light of the EEOC's evidence of Cotton's and Gard's alleged statements connecting Nwabugwu's accent to his potential placement as a branch manager and consequently, his suitability (or lack of suitability) for admission into the BMTP. Thus, I instructed the jury that it must determine whether race and/or national origin was a motivating factor in Orkin's decision not to place Nwabugwu in the BMTP, and if so, I further instructed the jury, to determine whether Orkin would have made the same decision in the absence of consideration of Nwabugwu's race and/or national origin.[8]

## III. ANALYSIS

### A. Race Discrimination Claim

 Orkin argues that the EEOC has failed to present sufficient evidence to per-

---

8. Interestingly, both the EEOC and Orkin requested that I instruct the jury solely as to pretext. The EEOC argued that a pretext charge would require the jury only to find that race or national origin was a "motivating reason" for the employment decision. In the Fourth Circuit, however, the standard is not nearly so plaintiff-friendly; the proper standard is whether race or national origin was a "determinative factor" or a "but for" cause for the employment action. *See e.g.,*

*Fuller,* 67 F.3d at 1143 (citing *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). For its part, Orkin argued that the EEOC failed to adduce sufficient direct evidence to warrant a mixed motive instruction. Although I think the question is a close one, I rejected Orkin's contention in reliance upon Blight's testimony and the other evidence summarized in text.

mit a reasonable jury to find that race was a motivating factor in the decision not to place Nwabugwu into the BMTP. In contrast, the EEOC alleges that it has presented sufficient evidence that Orkin's "non-discriminatory reason for not selecting Mr. Nwabugwu is pretextual" and that the evidence demonstrates that race "was a motivating reason for the discriminatory treatment." [9]

Close scrutiny of the evidence in the record, viewed in the light most favorable to the plaintiff as it must be, reveals that the EEOC falls short of presenting sufficient evidence for a reasonable jury to return a verdict in its favor with respect to race. The EEOC's evidence pertaining to race discrimination is unmistakably thin and such a "mere scintilla of evidence" is insufficient to withstand a motion for judgment as a matter of law. Accordingly, I will grant Orkin's motion for judgment with respect to the race discrimination claim.

For example, the EEOC relies heavily on the fact that Jeffrey Slocum, a white employee who was evaluated by Helms at the same time as Nwabugwu, was placed into the BMTP. It argues that Slocum received an assessment from Dr. Helms that tracked the assessment given Nwabugwu, that Slocum's employment evaluations were weaker than Nwabugwu's and that Orkin did not require Slocum to gain experience in other positions before being placed into the BMTP; thus, the EEOC asserts that this showing represents substantial evidence of racial discrimination. [10]

Contrary to the EEOC's arguments, however, this evidence is not substantially probative of racial discrimination. Slocum was not placed into the BMTP immediately after his 1992 evaluation. Instead, Orkin waited over two years and watched Slocum's professional development before placing him into the BMTP. This course of action was not inconsistent with the Helms assessment. In fact, Nwabugwu might have experienced a similar outcome had his sales performance not later declined, and had he not refused the service manager position. Regardless, the fact that Slocum was eventually placed into the BMTP does not suggest any racial animus on the part of Orkin in failing to place Nwabugwu into the BMTP immediately. [11]

The EEOC also asserts that Orkin's insistence that Nwabugwu work as a service manager before entering the BMTP demonstrates racial animus because a similar requirement was not imposed on other white employees. This argument is unavailing. Dr. Helms suggested that Nwabugwu would make a better service manager than sales manager because of his emphasis on the need to provide quality service to customers.

Furthermore, in 1992. Helms did not think that Nwabugwu was ready for branch management. Gard testified that he relies heavily on Helms's assessments. The evaluation did not include any reference to race whatsoever; hence, Gard's reliance on the assessment and its recommendation for service management cannot

9. The EEOC's submission continues to treat this case as a pretext case, even though I instructed the jury on the mixed motive theory of recovery.

10. In addition, the EEOC contends that Orkin's treatment of two other white employees, Dale Diver and Ed Sveum, shows disparate treatment of Nwabugwu. For example, Helms recommended that Orkin place Diver on a slow track to management and that Sveum was not management material. Thus, the EEOC argues that Orkin's placement of both employees into the BMTP is evidence of race discrimination. Neither employee, how-

ever, is similarly situated to Nwabugwu. Sveum is the nephew of the company Vice–President and Orkin waited almost 36 months before placing Sveum in the BMTP, in part because of Helms's evaluation. Similarly, Orkin argues that Diver also was required to wait before being placed into the BMTP.

11. Nwabugwu testified that Gard told Slocum that Slocum was the type to succeed at Orkin: white and all-American. Slocum denied hearing such a comment or repeating it to Nwabugwu.

be attributed to racial animus. Although it is undisputed that Orkin did not require all BMTP candidates to work as a service manager before being allowed entry into the BMTP, it is equally undisputed that Orkin did wait considerable periods of time after an employee was evaluated by Helms to assess his or her development if Helms suggested such a course. Thus, the EEOC has not presented probative evidence that the decision to delay Nwabugwu's possible placement into the BMTP by having him perform a new job was motivated by racial animus.

The EEOC also urges that Orkin's use of a Confederate flag at one of its meetings demonstrates that Gard harbored racial animus against African Americans. Nwabugwu testified that at a sales meeting or rally, in which the northern regions were pitted against the southern regions, someone waived a Confederate flag around the room and the employees were told to sing *Dixie*. Nwabugwu was quite upset by the incident and complained to Copen about it. This incident, although understandably quite distressing to Nwabugwu, does not support the inference that Orkin did not promote Nwabugwu because of his race. This type of "stray" event is utterly unconnected to the employment decision at hand and is thus not probative of discrimination. *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 549 (4th Cir.1995) ("There must be some 'nexus . . . between the alleged discriminatory state-

ments and any of the employment decisions made by the [employer].' ") (quoting *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir.1992)), *overruled in pt. on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Therefore, the EEOC cannot rely on the Confederate flag incident to support its claim for racial discrimination.

Finally, the EEOC argues that Gard told Nwabugwu that there were certain areas of the country in which Orkin would not place him, and cited Forsyth County, Georgia, a county with a history of hostility to African Americans, as an example.[12] Gard denies making this statement. It is undisputed that Orkin does not have any branches in Forsyth County. Moreover, even assuming that Gard made this statement, in the absence of any other probative evidence of racially discriminatory animus, the statement is insufficient to show that race was a motivating factor behind Orkin's decision not to place Nwabugwu in the BMTP.[13] Accordingly, I will grant judgment in favor of Orkin on the race discrimination claim.[14]

**B. National Origin Claim**

■ Orkin also argues that the EEOC has failed to present sufficient evidence for a reasonable jury to conclude that Nwabugwu's national origin was a motivating factor in his failure to be placed in the BMTP. Fed.R.Civ.P. 50 requires, however,

12. The EEOC did not explain to the jury, in any detail, the significance of the alleged "Forsyth County" remark. Perhaps the EEOC assumed that the members of the jury had read *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 125, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), in which the Supreme Court recognized that Forsyth County "has had a troubled racial history." *And see id.* ("In 1912, in one month, its entire African–American population, over 1,000 citizens, was driven systematically from the county in the wake of the rape and murder of a white woman and the lynching of her accused assailant. Seventy-five years later, in 1987, the county population remained 99% white.").

13. EEOC investigator Aaron Blight did not include in his notes any reference to race made by Gard or Cotton during their telephone interviews. Thus, the EEOC's reliance on Blight's notes to sustain its race discrimination claim is misplaced.

14. It bears mention that although the jury was unable ultimately to reach a unanimous verdict, the foreperson had marked the answer "no" on the verdict form to the question asking whether "the jury find[s] by a preponderance of the evidence that race was a motivating factor in Orkin's decision not to place Emmanuel Nwabugwu in the Branch Manager Training Program."

that I view the evidence in the light most favorable to the plaintiff and because a reasonable jury *could* conclude that national origin was a motivating factor in the decision not to place Nwabugwu into the BMTP, I will deny Orkin's motion.

■ "Discrimination based on manner of speaking can be national origin discrimination." *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 548 (6th Cir.1991). To that end, the EEOC's regulations provide that national origin discrimination encompasses "the denial·of employment opportunity because . . . an individual has the . . . linguistic characteristics of a national origin group." *Rivera v. Baccarat, Inc.,* 10 F.Supp.2d 318, 324 (S.D.N.Y.1998) (citing 29 C.F.R. § 1606.1). Accordingly, an adverse employment decision may only be based upon an employee's accent if that accent "interferes materially with job performance." *Fragante v. City and County of Honolulu,* 888 F.2d 591, 596 (9th Cir. 1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 942 (1990); *Rivera,* 10 F.Supp.2d at 324.

The EEOC has presented sufficient evidence to withstand Orkin's motion for judgment on its national origin claim. For example, Dr. Helms's assessment discussed Nwabugwu's accent and foreign culture on more than one occasion, namely, in the context of his intelligence, his ability to "read people," and his communication skills. *See* Joint Ex. 1. Orkin relied heavily on this assessment, which both implicitly and explicitly addressed Nwabugwu's national origin.[15] In addition, Nwabugwu testified that both Cotton and Gard discussed with him the limits of his potential placement with Orkin, as a branch manag-

er, to metropolitan markets. This evidence assumes enhanced significance because of Orkin's insistence that branch managers be willing to relocate to any area of the country. Thus, if Orkin would not place Nwabugwu in certain locales, a reasonable jury could conclude that Orkin would not want to waste its resources training Nwabugwu to be a branch manager, if in fact, his mobility was limited.

Moreover, the contemporaneous (and almost verbatim) notes taken by EEOC Investigator Blight during his telephone interviews with Gard and Cotton reveal sufficient evidence, if credited by a jury, for a verdict in favor of the EEOC. Blight's testimony at trial was admittedly less than overwhelming. His written notes that were admitted into evidence, however, portray a deeper and more profoundly insensitive, if not outright invidious, corporate attitude of intolerance, an attitude that, in spite of Nwabugwu's many years of faithful and positive performance, exposed itself as obsessed Nwabugwu's accent, the effect of which in a business environment the jury, having heard Nwabugwu testify at length during trial, could judge for itself.[16]

For instance, according to Blight's contemporaneous notes, Gard admitted that he asked Nwabugwu if Nwabugwu's accent would be a problem and recalled discussing Nwabugwu's placement in a metropolitan market (although Gard insists that it was Nwabugwu who preferred a metropolitan branch). In addition, Blight's notes state that Cotton commented that "in urban area[s], clientele more close to [Nwabugwu's] ethnicity . . . could comprehend and understand [him]." Pl.'s Ex. 12. Cot-

---

**15.** Orkin argues that Dr. Helms's recommendation that Nwabugwu work as a service manager, a position that involved more communication with people, undermines the EEOC's contention Nwabugwu's national origin was the motivating reason for the adverse employment decision. This argument has considerable merit; however, on a Rule 50(b) motion, I cannot choose among the parties' arguments which go to the weight of the evidence. I can only decide whether a rea-

sonable jury *could* find in favor of the EEOC, the non-movant.

**16.** Blight also drafted affidavits purporting to reflect his conversations with Gard and Cotton. Both individuals refused to sign them, claiming that they were inaccurate characterizations of their interviews. I declined to admit these draft "affidavits" into evidence.

ton also allegedly stated to Blight that he asked Nwabugwu about the Philadelphia/New York area, "because in those branches, or Chicago, seemed to be the type of clientele and type of people who comprehend and understand for [Nwabugwu] to move in and feel comfortable." *Id.*

This evidence comprises far more than "a scintilla." To the contrary, when it is viewed in the aggregate, the conclusion is inescapable that a reasonable jury *could* conclude that Nwabugwu's national origin, as manifested by and in his accent, was a motivating factor in Orkin's decision not to place him in the BMTP. Accordingly, I will deny Orkin's motion for judgment on the national origin claim.

## C. Punitive Damages

■ At the close of the presentation of evidence, I granted Orkin's motion to dismiss the EEOC's claim for punitive damages because in my view of the evidence, the conduct complained of was not sufficiently egregious to support an award of punitive damages under Fourth Circuit precedent. *See e.g., Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 766 (4th Cir.1998) (holding that the discriminatory conduct was not sufficiently egregious to have the issue submitted to a jury), *vacated in light of Kolstad v. American Dental Assoc.,* —— U.S. ——, 119 S.Ct. 2118, —— L.Ed.2d —— (1999); *Harris v. L & L Wings,* 132 F.3d 978, 982 (4th Cir.1997) ("Punitive damages are 'an extraordinary remedy,' to be reserved for egregious cases.").

In *Kolstad v. American Dental Assoc.,* —— U.S. ——, 119 S.Ct. 2118, —— L.Ed.2d —— (1999), the Supreme Court resolved a conflict among the courts of appeals as to the proper standard for punitive damages under 42 U.S.C. § 1981a.[17] The Court rejected the contention that punitive damages are available only in cases of egregious conduct of intentional discrimination. *See id.* at 2124 ("[§ 1981a] does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind."). Rather, the Court held that to support an award of punitive damages, the evidence need only show that an "employer ... act[ed] with 'malice or with reckless indifference to [the plaintiff's] federally protected rights.'" *Id.* (*citing* 42 U.S.C. § 1981a(b)(1)).

Accordingly, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 2125.[18] Applying *Kolstad* to the facts in the case at bar (viewed in the light most favorable to the EEOC) reveals that the EEOC has adduced substantial evidence that Orkin acted with reckless disregard (but not malice) in respect to Nwabugwu's rights under Title VII. Cotton's statements to Blight regarding the "clientele more close to [Nwabugwu's] ethnicity ... could comprehend and understand [him]," and Gard's alleged statements to Nwabugwu about his placement in a metropolitan market and about his accent being a problem support this conclusion and would adequately support a jury finding that a punitive damages award is warranted. In the same vein, Dr. Helms's comments about Nwabugwu's accent, education, and culture[19] and the heavy reliance on this evaluation by Gard, support the EEOC's claim for punitive damages.[20]

17. The availability of punitive damages under Title VII is created in 42 U.S.C. § 1981a.

18. The Court recognized that in some circumstances, i.e., when an employer is unaware of a federal prohibition, when an employer holds a good faith belief that its conduct is lawful, or when the "underlying theory of discrimination may be novel or poorly recognized," punitive damages would not be available. *See Kolstad,* —— U.S. at ——, 119 S.Ct. at 2125.

19. On the special interrogatory form submitted to the jury, the jury foreperson checked off "yes" to the question of whether Dr. Helms's evaluation reflected a race or national origin bias on Dr. Helms's part.

20. Orkin and the EEOC dispute whether the actions of Dr. Helms (and Gard, for that mat-

694

*Kolstad* makes clear that an employer's conduct need not be independently egregious to justify submission of the issue of punitive damages to the jury; the focus is upon the employer's state of mind. *See Kolstad*, —— U.S. at ——, 119 S.Ct. at 2124. Because the EEOC has presented sufficient evidence to meet this recently enunciated standard, its motion to reconsider will be granted.

## IV. CONCLUSION

For the reasons stated above, Orkin's motion for judgment will be granted with respect to the race discrimination claim and denied with respect to the national origin claim. The EEOC's motion to reconsider will be granted and the punitive damages claim restored. An order follows.

ter) may be imputed to Orkin for purposes of Orkin's potential liability for punitive damages. *See Kolstad,* —— U.S. at ——, 119 S.Ct. at 2118 ("The Restatement of Agency places strict limits on the extent to which an agent's misconduct may be imputed to the principal for purposes of awarding punitive damages."). Gard's control over the placement of employees into the BMTP and Orkin's unstint-ing, long-term reliance on Dr. Helms's evaluations of management candidates strongly suggest (notwithstanding the latter's ostensible status as an independent contractor) that each acted within the scope of his engagement and in a managerial capacity. The parties will have an opportunity at the retrial to further develop the facts pertinent to this inquiry.